# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| MATTHEW J. CHANG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-2139 (RCL) |
| | ) | |
| MICHAEL CHERTOFF, | ) | |
| Secretary, Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MOTION TO DISMISS OR TRANSFER

Defendants Michael Chertoff, et al., through undersigned counsel, hereby move for dismissal of the complaint pursuant to Rule 12(b)(1) for lack of jurisdiction. In the alternative, Defendants move that the case be transferred to the District of Connecticut. A proposed order and memorandum of points and authorities are attached hereto.

Dated: April 25, 2008                 Respectfully submitted,

/s/ _____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/ _____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ _____
BRANDON L. LOWY,
Special Assistant United States Attorney
555 Fourth St., NW
Washington, D.C. 20530
Phone: (202) 307-0364
Brandon.Lowy@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
MATTHEW J. CHANG,                   )
                                    )
Plaintiff,                          )
                                    )
v.                                  )          Civil Action No. 07-2139 (RCL)
                                    )
MICHAEL CHERTOFF,                   )
Secretary, Homeland Security, *et al.*,  )
Defendants.                         )
_____)


**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS,**
**OR IN THE ALTERNATIVE, TO TRANSFER**

**INTRODUCTION AND SUMMARY**

Congress has expressly withdrawn federal court jurisdiction over the discretionary

judgments, actions, and decisions United States Citizenship and Immigration Services

("USCIS") makes when reviewing petitions for immigration benefits.  Nonetheless, Plaintiff

Matthew J. Chang asks this Court to intervene in that process, and order USCIS to complete its

adjudication of Form I-485 "adjustment of status" application that Plaintiff filed to seek lawful

permanent resident status.  USCIS has not completed its adjudication of Plaintiff's I-485

application because the national security screenings - which the FBI conducts for all adjustment

applicants - are not yet complete, and Plaintiff does not meet the criteria for having his

application reviewed while those screenings remain pending.  Moreover, the D.C. Circuit has

declined to intervene in agency delay cases when "a judicial order putting the petitioner at the

head of the queue would simply move all others back one space and produce no net gain."

Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003).

Giving Plaintiff's application precedence over others' presents exactly that type of situation.

The Court lacks jurisdiction to intervene in the adjudication process, and Plaintiff's complaint should be dismissed.

Finally, Defendants move in the alternative to transfer this case to the United States District Court for the District of Connecticut. Plaintiff resides in the District of Connecticut, and the USCIS Hartford Field Office is located in that district. The only nexus between this District and the case is the fact that the agency heads named as defendants have offices in Washington, D.C. However, most of the events at issue in this complaint - namely, the processing and adjudication of Plaintiff's application - involve adjudicative actions that have been and will be taken by USCIS staff at the Hartford Field Office in Hartford, Connecticut. Accordingly, the District of Connecticut is a more appropriate forum for this case than this Court, and the interests of justice support transfer.

## **BACKGROUND**

### A.    **Statutory and Regulatory Background**

#### 1.    Adjustments of Status and Background Investigations

The Immigration and Nationality Act permits the Attorney General "in his discretion and under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). Aliens that seek such adjustments of status file applications referred to as an "I-485." The procedures for admitted aliens to apply for adjustment of status are set forth at 8 C.F.R. part 245.

USCIS processes adjustment applications in chronological order based on the date of receipt. Neither the statute nor the regulations establish a time frame in which adjudication must occur. The applicant must show that (s)he is not inadmissible to the United States under any

statutory ground of inadmissibility set forth at section 212(a) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a), including health-related, criminal, terrorist, and other grounds.  <u>See</u> 8 U.S.C. § 1255(a)(2).  An alien seeking adjustment of status bears at all times the burden of persuading the Attorney General to exercise his discretion in the alien's favor.  <u>See</u> <u>Randall v. Meese</u>, 854 F.2d 472, 474 (D.C. Cir. 1988); <u>Jain v. Immigration and Naturalization Service</u>, 612 F.2d 683, 687 (2d Cir. 1979); <u>see generally</u> <u>Elkins v. Moreno</u>, 435 U.S. 647, 667 (1978) ("... adjustment of status is a matter of grace, not right...").

Before a decision is rendered on an alien's I-485 application for adjustment of status, USCIS requests that the FBI conduct a national security screening.  <u>See</u> Declaration of Ethan Enzer, ¶ 4 (Exh. 1) ("Enzer Decl.").  These checks currently include: (a) an FBI fingerprint check; (b) a check against the Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland Security and contains records and "watch list" information from more than twenty law enforcement and intelligence agencies; and (c) an FBI name check.  <u>Id.</u>; <u>see</u> <u>also</u> 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to obtain and exchange information for use in enforcing the INA and in the interest of the internal and border security of the United States).

These security checks sometimes raise significant derogatory information which affect an applicant's eligibility for an immigration benefit.  <u>See</u> Enzer Decl. ¶ 5.  In those cases, USCIS must conduct further inquiry to resolve any outstanding issues, and in some cases may initiate proceedings to remove the alien from the United States.  <u>Id.</u>  As an exercise of its discretion to determine the manner in which adjustment of status applications will be adjudicated, USCIS issued a February 4, 2008 policy memorandum which modified its prior practice regarding name

3

checks.  Prior to that date, USCIS would not complete the adjudication of an adjustment of status application until it had received all name check results from the FBI and resolved any national security or other issues that might arise from the name check results.  The policy memorandum reaffirmed USCIS's prior conclusion that conducting name checks in connection with all applicants for immigration benefits is an important measure for protecting national security interests and ensuring the integrity of the immigration process.  Accordingly, USCIS still initiates name checks for all applicants, and allows time for the checks to clear prior to completing its adjudication.  However, if the FBI has not completed the name check within 180 days of USCIS's transmission of that check, the policy memorandum permits USCIS to approve adjustment of status applications which are "otherwise approvable."  If the results of the name check yield information that would make the person ineligible for the benefit being sought, the Department of Homeland Security may detain the permanent resident and initiate proceedings to remove him from the United States.

Because of heightened national security concerns, a review of the background check procedures employed by USCIS was conducted in November 2002.  See Decl. of Michael A. Cannon, ¶ 23 (Exh. 2) ("Cannon Decl.").  It was determined that more detailed, in-depth clearance procedures were required in order to better protect the people and the interests of the United States.  See id.  The name check clearance performed by the FBI was one of the procedures that needed revision.  See id.  Prior to November 2002, only those "main" files that could be positively identified with an individual were considered responsive.  See id.  The FBI subsequently altered its search criteria because the risk of missing a match to possible derogatory record(s) was too great.  See id.  Therefore, the search criteria were expanded to access reference

4

files in addition to the main files.  See id.  From a processing standpoint, this change meant the

FBI would have to review many more files for each individual.  See id.

In December 2002 and January 2003, USCIS resubmitted 2.7 million name check

requests to the FBI in addition to the regular submissions.  See id. ¶ 24.   Over 440,000 of the

responses to the 2.7 million resubmitted name check requests indicated that the FBI may have

information relating to the subjects.  See id.  The FBI's processing of the more than 440,000

resubmissions that require follow-up to resolve the name checks has delayed the processing of

the regular submissions from USCIS, although fewer than 630 of those re-submitted name check

requests remain pending.  See id.  Several other factors contribute to potential delays in

processing background checks for an applicant, including the volume of incoming name check

requests, the number of hits on a name when it is reviewed, the processing of common names,

and the accessibility of the FBI records needed for review.  See id. ¶¶ 26-29.  The FBI generally

processes name check requests on a first-in, first-out basis at each stage of its investigation

(unless USCIS specifically requests that a particular name check be expedited or the name

checks have been prioritized as "single hit" name checks).  See id. ¶¶ 18-20.

      2.    Judicial Review of Immigration-Related Decisions

In 1996, Congress passed legislation to reduce, and in some cases eliminate, judicial

review of certain immigration-related decisions made by the former Immigration and

Naturalization Service ("INS").  See Sec. 306, Illegal Immigration Reform and Immigration

Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (September 30, 1996).  In

particular, 8 U.S.C. § 1252(a)(2)(B)(ii), divests courts of jurisdiction to review any "decision or

action of the Attorney General the authority for which is specified ... to be in the discretion of the Attorney General, other than the granting of [asylum]."

Because some courts, contrary to Congress' desires, found that this jurisdiction-stripping bar applied only to discretionary decisions made during removal (deportation) proceedings, on May 11, 2005, Congress amended Section 1252(a)(2)(B)(ii) to clarify that its proscription against judicial review applies regardless of whether the discretionary judgment, decision or action is made in removal proceedings. <u>See</u> Section 101(f), Real ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 231; <u>see also</u> House Conference Report 109-72 at 170 (May 3, 2005). The REAL ID Act also added references to the Secretary of Homeland Security consistent with the reorganization of INS (under the Attorney General and U.S. Department of Justice) into USCIS (under the Department of Homeland Security). <u>Id.</u> After passage of the Real ID Act, the statute reads as follows:

> (B) Denials of discretionary relief
>
>> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review-
>>> (i) any judgment regarding the granting of relief under section 1182(h), 1182(I), 1229b, 1229c, or 1255 of this title, or
>>> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. 1252(a)(2)(B).

**B.      Plaintiff's Application**

Plaintiff Matthew Chang, a national of Canada, filed a Form I-485 application to register permanent residence or adjust status on February 28, 2005.  <u>See</u> Compl. ¶ 10; Enzer Decl. ¶3.

6

This application was filed with USCIS's Vermont Service Center.  See Compl. ¶ 10; Enzer Decl.
at ¶ 6.  Plaintiff Chang attended fingerprint appointments in New Rochelle, New York, on
December 26, 2006, and May 29, 2007.  Compl. at ¶ 11.

    USCIS received the results of the most recent FBI fingerprint checks on May 29, 2007.
Enzer (CIS) Decl. ¶ 6.  The FBI fingerprint checks must be completed for each alien applicant for
an immigration benefit.  See Public Law 105-119.  Pursuant to current USCIS policy, fingerprints
so taken are valid for a period of 15 months after processing by the FBI.  Enzer Decl. ¶ 6.
Therefore, the first fingerprints are valid until August 28, 2008.  Id.  If a final decision regarding
Plaintiff's application is not reached by that date, another fingerprint appointment will be
scheduled for the applicant.  Id.  An IBIS check was initiated on the applicant on February 13,
2008, and is valid for six months.  Id.  If a final decision regarding Plaintiff's application is not
reached by August 12, 2008, a new IBIS check will be necessary.  Id.

    Shortly after Plaintiffs' application and petition were filed, USCIS requested that the FBI
conduct name checks in connection with the Form I-485 for "Matthew J. Chang".  See Enzer
Decl. ¶ 7; Cannon Decl. ¶ 43.  The background check for the name "Matthew J. Chang" was
completed by the FBI on February 6, 2008.  See Cannon Decl. ¶ 43.  However, USCIS has not
yet received the results of this name check transferred by the FBI.  See Enzer Decl. ¶ 7.  As a
result of the process in which name check requests and results are transmitted between USCIS
and FBI, it can take numerous months for USCIS to receive a response from the FBI after the
name check has been completed.  Id.

    The Plaintiff's application was transferred to the USCIS Hartford Field Office on January
29, 2008.  Enzer Decl. ¶ 3.  Plaintiff was interviewed on his application for adjustment of status on

February 13, 2008 at the Hartford Field Office. Enzer Decl. ¶ 8. Then, it was discovered that

Plaintiff had two distinct names, "Matthew Chang" and "Jin Woo Chang". Id. Plaintiff had

provided the name "Matthew Chang" on his application, yet other documents, such as his birth

certificate and G-325 "Biographic Information" Sheet, indicate the name of Jin Woo Chang. Id.

However, as USCIS only uses the first page of an application to determine the names to be sent to

the FBI for a name check, it was not brought to the attention of USCIS that "Jin Woo Chang"

should be submitted to the FBI for a name check until Plaintiff was interviewed on February 13,

2008. Id. Immediately thereafter, USCIS requested that the name "Jin Woo Chang" be submitted

to the FBI for a name check. Id. at ¶ 9. On April 11, 2008, USCIS resubmitted the request for a

FBI name check on "Jin Woo Chang." Id. As a result of the process in which name check

requests and their results are transmitted between USCIS and FBI, it can take numerous months

for the FBI to receive a name check request from USCIS. Id. USCIS has not yet received the

results of this name check transferred by the FBI. See Id.

Plaintiff initiated this action with a mandamus complaint filed on November 26, 2007.

On January 30, 2008, the Court dismissed this action without prejudice for Plaintiff's failure to

obey the Court's order to file with the Clerk of Court either proof of service or a status

memorandum indicating all steps taken to date to effect service. Dkt. Entries 2, 3. Upon

Plaintiff's motion, the Court set aside its dismissal of the action on February 5, 2008. Dkt. Entry

6. Plaintiff asks the Court to order Defendants to complete adjudication of his I-485 application

within thirty days. Compl., Relief Requested.

8

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Plaintiff's claims.  See Fed. R. Civ. P. 12(b)(1).  When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77 F. Supp.2d 91, 98 (D.D.C. 1999).  "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003).  In addition, plaintiff bears the burden of persuasion, and must establish subject matter jurisdiction "by a preponderance of the evidence."  Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98.  To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at 64.

## ARGUMENT

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW PLAINTIFF'S CLAIMS.

 "Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute."  Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district courts "have only such jurisdiction as the Constitution and the Congress grant them").  The statutes cited in the complaint do not establish a statutory basis for the Court to exercise

9

jurisdiction over this case. The Court lacks jurisdiction to review Plaintiff's challenge to USCIS's processing of his I-485 application because Section 1252 of the INA precludes judicial review of USCIS's "judgments" on applications for adjustment of status, and of numerous other discretionary decisions and actions involving immigration-related applications and proceedings. 8 U.S.C. § 1252(a)(2)(B). That provision applies "notwithstanding any other provision of law," thereby trumping any alternative source of jurisdiction. Id. The FBI has complete discretion to determine the scope and pace of its national security investigations. Accordingly neither the Administrative Procedures Act ("APA") nor the Mandamus Act permit this Court to review that discretionary process. USCIS has equally broad discretion to determine the pace and manner of adjudicating adjustment of status applications. Accordingly, there would be no APA or mandamus jurisdiction over Plaintiff's challenge to that process even if the INA did not preempt other sources of jurisdiction.

**A.     8 U.S.C. § 1252(a)(2)(B) Divests This Court of Jurisdiction Over Plaintiff's Challenge to USCIS's Adjudication of His Application.**

Section 1252(a) of the INA expressly precludes judicial review of adjustment of status applications and other discretionary decisions. As noted supra, Section 1252(a)(2)(B), provides that "no court shall have jurisdiction to review:"

> (i)     any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)     any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be in the discretion of the Attorney General or the Secretary of Homeland Security, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added).  In seeking to compel the adjudication of an adjustment of status application under 8 U.S.C. § 1255, Plaintiff's claims fall squarely within the plain meaning of each of these terms.

First, the authority to adjudicate adjustment of status applications arises under 8 U.S.C. § 1255(a), and subsection (i) expressly bars judicial review of "any judgment regarding the granting" of such an application.  8 U.S.C. §§ 1252(a)(2)(B)(i), 1255(a).  Second, Section 1252(a)(2)(B)(ii) also divests this Court of subject matter jurisdiction over Plaintiff's claims because the adjudication of an adjustment of status application is a discretionary action and decision.  "[T]his subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which is composed of 8 U.S.C. §§ 1151 through 1378.  Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter II.  The "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General," pursuant to Section 1255(a).  See 8 U.S.C. § 1255(a) (providing that an alien's status "*may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe."  Id. (emphasis added)).  The statute provides no time frame for the adjudication of I-485 applications, and gives the Attorney General complete discretion to prescribe any appropriate regulations.  See id.  The Attorney General's discretion over the process of adjudicating an I-485 necessarily extends to the assessment of when, whether, and how to grant that application.

That statutory language has led numerous courts to conclude that Section 1252(a)(2)(B)(ii) bars judicial review of claims challenging aspects of the I-485 adjudicative process.  See, e.g., Luo v. Keisler, 521 F. Supp. 2d 72 (D.D.C. 2007) (discussing Section

11

1252(a)(2)(B) and granting motion to dismiss action to compel adjudication of plaintiffs' I-485s); Orlov v. Howard, 523 F.Supp.2d 30, 36 (D.D.C. 2007) ("Therefore, because the adjustment process, including the pace of processing applications, falls within the discretion of USCIS, and because the pace of processing applications, including completing security checks, constitutes an 'action' under the plain meaning of the word, judicial review of plaintiff's claim is precluded by § 1252(a)(2)(B)(ii)."); Sun v. Gonzales, 1:07-cv-00504 (JDB), Order, December 10, 2007 (Pacer Dkt. 12) at 3 ("Because 8 U.S.C. § 1252(a)(2)(B)(ii) divests federal courts of jurisdiction to review a discretionary decision or action of USCIS, and an 'action' includes any discretionary act or series of acts within the adjustment of status process (including the pace of completing various security checks), this Court lacks jurisdiction over plaintiff's petition.") (Order attached hereto as Exh. 3); Grinberg v. Swacina, 478 F.Supp.2d 1350 (S.D. Fla. 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss); Safadi v. Howard, 466 F. Supp. 2d 696 (E.D. Va. 2006) (same); Sharkey v. Ganter, 2006 WL 177156 (S.D.N.Y.)(same); Dinsey v. Department of Homeland Security, No. 03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no jurisdiction over action to compel USCIS to adjudicate adjustment of status application because the INA "expressly places the adjustment of immigration status within the 'discretion' of the Attorney General"); see generally Zhu v. Gonzales, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a) precludes judicial review of Attorney General's discretionary decision to require party to obtain labor certification prior to obtaining a work visa); Mahaveer, Inc. v. Bushey, No. 04-1275, 2006 WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary denial of visa).

In this case, USCIS is actively adjudicating Plaintiff's adjustment of status application, but has concluded that it is not yet ripe for a final decision. As noted *supra*, USCIS has determined, in its discretion, that it must wait 180 days for the FBI to complete name checks for adjustment of status applicants before approving any such application. See Enzer Decl. ¶ 10. The name check for Plaintiff's birth-name, Jin Woo Chang, has been pending less than 180 days. See id. The 180 days during which USCIS must await the results of the FBI name checks is an integral part of the adjudicative process, as it permits USCIS to ascertain whether the applicant poses national security risks and protects the integrity of immigration benefits. Therefore, it is immune from judicial review. See Orlov, 523 F. Supp. 2d at 35-36 (USCIS's submission of name checks and decision to await the results of those checks is an "action" which cannot be reviewed pursuant to Section 1252(a)(ii)(B)(2)); Luo, 521 F. Supp. 2d at 73-74 (pace of the processing of an adjustment of status application is unreviewable under Section 1252(a)(ii)(B)(2)).

Defendants recognize that federal district courts are split on this issue, and that some judges have concluded that they have jurisdiction to review the reasonableness of any delays in completing adjudication of an I-485 petition. Compare, e.g., Liu v. Novak, 509 F. Supp. 2d 1 (D.D.C. 2007) (exercising jurisdiction over claim alleging unreasonable delay in resolving adjustment of status application); Alsharqawi v. Gonzales, No. 06-1165, 2007 WL 1346667 (N.D. Tex. Mar. 14, 2007) (same) with Luo, 521 F. Supp. 2d at 72 (dismissing claim alleging unreasonable delay in resolving adjustment of status application for lack of jurisdiction); Orlov, 523 F.Supp.2d at 36 ("judicial review of plaintiff's claim of delay in the adjustment process is precluded by § 1252(a)(2)(B)(ii)"); Sun, 1:07-cv-00504 (JDB), Order, December 10, 2007

13

(Pacer Dkt. 12) at 3 ("this Court lacks jurisdiction to review the ongoing pace at which plaintiff's application [Form I-485] is being adjudicated."); Elzer v. Mueller, No. 07-01666, 2007 WL 1221195 (E.D. Pa. Apr. 23, 2007) (dismissing challenge for lack or jurisdiction); Grinberg, 478 F. Supp. 2d at 1352 (same).  However, the D.C. Circuit has not yet addressed the issue, and the other courts' rulings are not binding on this Court.  As the foregoing discussion makes clear, the INA's jurisdiction-stripping provisions are best read as precluding judicial review of Plaintiff Chang's claims concerning the adjustment of status application. "[T]he determination that § 1252(a)(2)(B)(ii) precludes judicial review over plaintiff's claim is further supported by the general rule that courts should refrain from interfering with matters of immigration and national security."  Orlov, 523 F.Supp.2d at 36.

**B.      No Other Statute Gives the Court Jurisdiction to Review Plaintiff's Challenge to the Pace of the Adjudication of His I-485 Application.**

Even if some other statute conferred jurisdiction to review Plaintiff's request for immediate adjudication of his application, the INA would foreclose the exercise of that jurisdiction because it applies "notwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(A); see Luo, 521 F. Supp. 2d at 74 n. 4 (citing INA and noting that it specifically precludes judicial review "notwithstanding any other provision of law"); Orlov, 523 F.Supp.2d at 34 ("under 8 U.S.C. § 1252(a)(2)(B)(ii) Congress clearly intended to preclude judicial review in this situation [delays in the adjustment process]"); Sun, 1:07-cv-00504 (JDB) at 3 (citing INA and noting that it "divests federal courts of jurisdiction to review a discretionary decision or action of USCIS");  Danilov v. Aguirre, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction.").  However

14

there is no alternative source of jurisdiction in this case.  The Mandamus Act does not apply because the process of adjudicating Plaintiff's application involves discretionary acts and decisions.  The Administrative Procedure Act is inapplicable for similar reasons.

**1.    The Mandamus Act Does Not Confer Jurisdiction Because The Adjudication of Plaintiff's Application Is A Discretionary Process.**

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction-stripping provisions of INA § 242 did not apply.  That statute gives district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes."  Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).  District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted).  Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'"  In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Here, Plaintiff lacks a clear right to immediate adjudication, and Defendants have no clear mandatory or ministerial obligation to adjudicate the applications or complete background checks within a particular time frame.  See Luo, 521 F. Supp. 2d at 74 n.4; Orlov, 523 F.Supp.2d at 37; Sun, 1:07-cv-00504 (JDB) at 4; Safadi, 466 F.Supp.2d at 700; Grinberg, 478 F. Supp. 2d

15

at 1354. The decision whether to grant or deny Chang's adjustment application is plainly

discretionary by statute. <u>See</u> 8 U.S.C. § 1255(a). Surely, that discretion permits USCIS to

enforce a background check requirement thereby ensuring that immigration benefits are not

granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national

security matters. There are no statutory provisions or regulations that mandate the adjudication

of adjustment applications within a particular time frame. USCIS's current policies prohibit

USCIS from granting an application if the name checks conducted in connection with the

application have been pending less than 180 days. Consequently, USCIS has no clear,

mandatory duty to finish adjudicating Plaintiff's application prior to completion of background

checks, or by a prescribed deadline. Its discretionary decision to complete its adjudication of

certain applications when the FBI requires more than 180 days to complete the name check

portion of the background checks imposes no clear, mandatory duty upon USCIS to finish

adjudicating Plaintiff's application at this time, because his name check for the name "Jin Woo

Chang" was submitted less than 180 days ago. Likewise, Plaintiff can point to no clear and

indisputable right to have the background checks completed within a specific time frame, and the

FBI has no statutory or regulatory duty to limit background examinations to a fixed period of

time. <u>See</u> <u>Shalabi v. Gonzales</u>, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006)

(denying plaintiff's request that the court compel that plaintiff's background check be

expedited). Those factors have led numerous district courts to find that mandamus relief is

unavailable in cases such as this. <u>See, e.g.</u>, <u>Orlov</u>, 523 F.Supp.2d at 37, at *8; <u>Sun</u>,

1:07-cv-00504 (JDB) at 4; <u>Li</u>, 482 F. Supp. 2d at 1177; <u>Grinberg</u>, 478 F. Supp. 2d at 1354;

<u>Safadi</u>, 466 F. Supp.2d at 700; <u>Saleh v. Ridge</u>, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); <u>Karan</u>

16

v. McElroy, No. 02 Civ. 6678 (JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003);

Zheng v. Reno, 166 F. Supp.2d 875, 880 81 (S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d

451, 453 (S.D.N.Y. 2000).  This Court should do the same.

> **2.     The Administrative Procedures Act Does Not Permit This Court to Review Plaintiff Chang's Challenge to USCIS's Processing of His Applications.**

Plaintiff also has no right to judicial review under the APA.  Although the APA is not an

independent source of subject matter jurisdiction, it operates in tandem with federal question

jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency

actions.  See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp. 2d at 1355;

Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005).  However, the APA expressly

precludes judicial review of agency actions in two circumstances: (1) if another statute

"preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by

law."  5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986).  Both factors

prevent Plaintiff from using the APA as a means of challenging USCIS's processing of his

application and/or the FBI's processing of his background checks.

First, as discussed above, the INA bars judicial review of challenges to the adjustment of

status adjudication process.  Accordingly, Section 701(a) of the APA, which "withdraws [an

APA] cause of action" to the extent another statute "precludes judicial review," prevents Plaintiff

from raising an APA challenge concerning the adjudication of his adjustment of status

application.  Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984); see 5 U.S.C. §

701(a); Beyond Pesticides v. Whitman, 360 F. Supp. 2d 69, 71 (D.D.C. 2004); see generally

Bruno v. Albright, 197 F.3d 1153, 1161-62 (D.C. Cir. 1999) (concluding that "the immigration

17

laws preclude judicial review of consular visa decisions" and therefore bar APA challenges to a visa decision).  Section 702 forecloses judicial review of Plaintiff's challenge to the adjudication of his application for the same reason, as it provides that "nothing herein affects other limitations on judicial review . . . or confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

Second, the APA bars judicial review of all of Plaintiff's claims because the USCIS and FBI actions Plaintiff has challenged are discretionary.  The APA generally permits challenges to "agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); see also 5 U.S.C. § 555(b) (indicating that agencies should conclude matters "within a reasonable time").  However, such claims are unreviewable by the courts if the relevant agency action is "committed to agency discretion by law."  Id. § 701(a)(2); see also Orlov, 523 F.Supp.2d at 37 (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004) ("a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.").  In Heckler v. Chaney, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion."  470 U.S. 821, 830 (1985).  As the Court explained, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"  Id.; see also Steenholdt v. Federal Aviation Admin., 314 F.3d 633, (D.C. Cir. 2003) (articulating same standard).  "The principal purpose of the APA limitations . . . - and of the traditional limitations upon mandamus from which they were derived

18

- is to protect agencies from undue judicial interference with their lawful discretion . . . ."
Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

        Plaintiff has no APA cause of action for "unreasonable agency delay" against USCIS because the timing of USCIS's adjudication of his application is expressly committed to agency discretion, as are all other aspects of processing the application.  Section 1255(a) permits the Attorney General to adjust an alien's status "*in his discretion* and under such regulations as he may prescribe."  8 U.S.C. § 1255(a) (emphasis added).  That is the type of "plenary" grant of discretion which renders agency actions unreviewable under the APA.  Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006).  No statutory or regulatory provisions provide a "meaningful standard" against which to measure USCIS's process of adjudicating such an application.  Heckler, 470 U.S. at 830.  Rather, the agency maintains complete discretion to determine "how and when" to adjudicate the application.  See id.  In contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and regulations governing Plaintiff Chang's adjustment of status application provide no time frame for when such an application must be adjudicated.  See Orlov, 523 F.Supp.2d at 37 ("[T]here are no statutory guidelines compelling USCIS to adjudicate adjustment of status applications within a certain period of time."); Zheng, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]").  USCIS's regulations establish no such deadlines, and its February 2008 policy memorandum is not implicated in this case.  Consequently, there is no standard against which the Court can measure whether USCIS has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1).  The fact that the adjudicatory process is committed to agency discretion by law renders claims relating to alleged

delays in the adjudication of an adjustment of status application unreviewable under the APA.
See Luo, 521 F. Supp. 2d at 74 n.4; Orlov, 523 F.Supp.2d at 37; Sun, 1:07-cv- 00504 (JDB) at 4;
Safadi, 466 F.Supp.2d at 700; Zheng, 166 F.Supp.2d at 878 89; Karan, 2003 WL 21209769, at
*1 ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the
discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the
plaintiff seeks."); see also Rahman v. McElroy, 884 F.Supp. 782, 787-88 (S.D.N.Y. 1995).   In
addition, at least two Supreme Court cases suggest that the presence of a specified time period
triggers courts' ability to compel agency action that is "unreasonably delayed" under § 706(1).
See Norton, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain
time period . . . a court can compel the agency to act . . . ."); Brock, 476 U.S. at 260 n.7 (finding
that because "the statutory command that the Secretary 'shall' act within 120 days does not
commit such action to the Secretary's discretion, . . . [t]he court would have the authority to
'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

   Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS has
"unreasonably delayed" adjudication of the application and the processing of Chang's
background checks, this Court would have to create a temporal standard out of whole cloth.  This
is a perilous task given the national security considerations that permeate USCIS's adjudicative
process and the obvious national security interest in through and complete FBI background
checks.  See Orlov 523 F.Supp.2d at 36 (declining "to impose an arbitrary deadline on USCIS
for the completion of such investigations" because "[i]nterference by this Court . . . could have
national security implications").   It is a well established proposition that judicial review of
immigration matters is narrowly circumscribed, and that control over immigration is largely

20

entrusted to the political branches of the government.  See Valenzuela Bernal, 458 U.S. at 864;

Diaz, 426 U.S. at 81 ("Since decisions in these matters may implicate our relations with foreign

powers, and since a wide variety of classifications must be defined in the light of changing

political and economic circumstances, such decisions are frequently of a character more

appropriate to either the Legislature or the Executive than to the Judiciary."). Moreover, as other

courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our

powerlessness to intervene, the judicial creation of such a duty would have the potential for

mischievous interference with the functioning of already overburdened administrative

agencies.'" Rahman, 884 F. Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179,

1182 (2d Cir. 1978)); see also Heckler, 470 U.S. at 831 82 (noting that "[t]he agency is far better

equipped than the courts to deal with the many variables involved in the proper ordering of its

priorities"); Luo, 521 F. Supp. 2d at 74 (concluding judicial intervention would be

"inappropriate" given national security concerns).  Those principles counsel against the

imposition of a judicially-created standard to gauge how long USCIS may wait for assurance that

the background checks have identified no national security reasons that would merit denial of an

applicant's adjustment application, or how much time the FBI may devote to its investigations.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO THE DISTRICT OF CONNECTICUT.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes

default rules for venue that apply to federal lawsuits where the underlying statutes do not specify

their own venue rules.  See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise

provided by law.").  Section 1391 identifies three possible bases for venue for claims against

federal government officials or agencies: (1) where a defendant "resides;" (2) the district where

"a substantial part of the events or omissions giving rise to the claim occurred;" or (3) where

"the plaintiff resides, if no real property is involved in the action." 28 U.S.C. § 1391(e).

Plaintiff appears to rely on the first prong of this test, and allege that venue is proper in this

Court because the agency heads named as Defendants have offices in the District of Columbia.

See Compl. ¶ 2.        When a plaintiff bases its venue arguments solely on federal agency

defendants' presence in Washington D.C., the venue challenge should be examined "very

closely."  Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That close scrutiny has

led courts in this District to invoke their transfer authority pursuant to 28 U.S.C. § 1404(a) and

transfer cases to a district with a closer nexus to the parties' dispute.  See, e.g., Cameron, 983

F.2d at 256 (ruling Washington, D.C. was not the proper venue because the sole connection to

Washington, D.C. was the inclusion of the Director of the Federal Bureau of Prisons and the

Attorney General in their official capacities); Abusadeh v. Chertoff, 2007 WL 2111036, at *6-*9

(D.D.C. July 23, 2007) (transferring mandamus action seeking adjudication of naturalization

application and petition to replace alien card to Southern District of Texas because that was

where the application was being adjudicated); Fayyaz v. Dep't of Homeland Security, No. 06-

2016, (D.D.C. Oct. 25, 2007) (unpublished Order) (transferring mandamus action concerning I-

485 to the Southern District of Texas because that is where plaintiff resided and the district in

which the USCIS office with jurisdiction over their applications was located) (Order attached

hereto as Exh. 4); Poliakova v. Gonzales, No. 07- 1210 (D.D.C. Dec. 17, 2007) (Order attached

hereto as Exh. 5) (transferring mandamus action concerning I-485 to Southern District of Florida

for the same reason); Rosales v. United States, 477 F. Supp.2d 213, 215-17 (D.D.C. 2007)

(transferring case against federal agency to district in which the challenged events took place);

Southern Utah Wilderness Alliance v. Norton, 315 F. Supp.2d 82, 886-89 (D.D.C. 2005)

(concluding environmental case should be transferred to Utah where D.C. officials only set

general policies and did not make specific decisions being appealed); Joyner v. District of

Columbia, 267 F. Supp.2d 15, 20-21 (D.D.C. 2003) (holding that the case's only connection to

Washington, D.C. was the situs of named federal government defendants and transferring to a

district with which the case had several connections).  Otherwise, "[b]y naming high government

officials as defendants, a plaintiff could bring suit here that properly should be pursued

elsewhere."  Cameron, 983 F.2d at 256.

    The fact that some of the Defendants are high government officials who reside in the

District of Columbia does not establish a sufficient connection to this District, and the Court

should transfer this case to the District of Connecticut.  Section 1404(a) permits the Court to

transfer this case to "any other district or division where it might have been brought" for the

"convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  A

threshold question is whether the case could have been brought in the district to which transfer is

sought.  See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v.

Barrack, 376 U.S. 612, 613 (1964)).  The Court then must engage in a case by case analysis and

balance the private interests of the parties with public interests such as efficiency and fairness.

Id. at 29; Abusadeh, 2007 WL 2111036, at *3.  The moving party bears the burden to establish

that it is proper to transfer the case.  See Southern Utah, 315 F. Supp. 2d at 86.  Trout Unlimited

v. United States Dep't of Agriculture, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots

Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted).  Plaintiff

could have brought this case in the District of Connecticut, and both the private and public

interests favor transfer to that court.

The District of Connecticut clearly is a district in which this case "might have been brought." Plaintiff resides within that district. USCIS's Hartford Field Office is responsible for adjudicating Plaintiff's application; therefore any relief Plaintiff may obtain will involve that office, which is located in Hartford, Connecticut. See Enzer Decl. ¶ 2. The adjudication at issue in this action is being conducted by USCIS staff located in the District of Connecticut, making venue proper in that court under 28 U.S.C. § 1391. See Abusadeh, 2007 WL 2111036, at * 6 (concluding venue was proper in Southern District of Texas because I-485 was being adjudicated there).

The private interests favor transfer. The factors courts consider when assessing those interests include: Plaintiff's choice of forum, Defendants' choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof. See Trout Unlimited, 944 F.Supp. at 16 (citation omitted). Although courts generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened when the forum chosen is not the plaintiff's home forum. See Shawnee Tribe v. United States, 298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)). Courts also apply less deference when the chosen forum has an inadequate nexus to the events in the case. See Southern Utah Wilderness Alliance, 315 F. Supp.2d at 86.

Plaintiff's choice of forum deserves little deference because he does not reside in this District, and because this District lacks meaningful ties to the controversy. Plaintiff resides in Connecticut. See Compl. ¶ 3. The District of Connecticut is a more appropriate forum, because that is where the relevant decisions were and will be made. As noted, the Hartford Field Office

24

is charged with adjudicating Plaintiff's adjustment application.  See Enzer Decl. ¶¶ 2, 3.  The named agency defendants will have no direct involvement in the adjudication of that application.  Accordingly, this case is similar to other cases in which courts have found that the private interests favor transfer because the "primary issue in th[e] case" concerns a decision made by an agency field office, and not headquarters.  Southern Utah Wilderness Alliance, 315 F. Supp.2d at 87; see, e.g., Rosales, 477 F. Supp. 2d at 216; Shawnee Tribe, 298 F. Supp.2d at 24; Sierra Club v. Flowers, 276 F.Supp. 62, 67 68 (D.D.C. 2003) (transferring case because federal officials in Florida made the relevant decision and officials in Washington, D.C. were not involved in the decision making process); see also Airport Working Group of Orange County, Inc. v. United States Dep't of Defense, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to DC was "attenuated" where D.C. officials were not actively involved in challenged decision).

The FBI's involvement in the background name check process also does not establish a close nexus to this District.  The background checks are not initiated by the FBI.  See Enzer Decl. ¶ 4.  The FBI's completion of those background checks is not monitored by USCIS in Washington, D.C., but rather by the Hartford Field Office.  See id. ¶¶ 4, 6-9.  Local officials at the Hartford Field Office conduct the decision making process and will make the final decision.  See id. ¶¶ 2, 5, 10.  In sum, the FBI has a limited role regarding Plaintiff's application: to conduct the background checks and send the results to USCIS.  It does not determine whether, when, or how the applications will be adjudicated.  See Cannon Decl. ¶ 39.  Accordingly, even if the FBI officer(s) conducting Chang's national security investigations were located in Washington, D.C., that would not make this Court the proper forum.

Other private interest factors also support transfer. The District of Connecticut is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there. As noted, that district is the home jurisdiction of the Hartford Field Office, which is charged with and is responsible for adjudicating Plaintiff's pending application. It is also the one in which Plaintiff resides. Since this case involves activities taking place in the District of Connecticut, there is local interest in resolving it there. See Schmidt v. American Institute of Physics, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise); Abusadeh, 2007 WL 2111036 at *8 (transferring case to jurisdiction where USCIS field office was located because of that district's interest in resolving the dispute). That also makes the District of Connecticut a more convenient jurisdiction in which to litigate this case because the people directly involved in making the determination as to Plaintiff's application are located in Connecticut. See Enzer Decl. ¶¶ 2-3.

The public interest also favors transfer. The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home. See Trout Unlimited, 944 F.Supp. at 16 (citation omitted); Airport Working Group of Orange County, Inc., 226 F. Supp.2d at 229. Since this action concerns federal law, the District of Connecticut is as familiar with the applicable law as the District of Columbia.

In addition, there is no evidence that the District of Connecticut's docket is significantly more congested than the District of Columbia's docket. See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. at 16; see also Exh. 6 (spreadsheet demonstrating caseload of both districts). In 2007 the District of Connecticut had substantially fewer pending cases than

this Court (2,822 in the District of Connecticut and 3,936 in this Court).  See id.  Accordingly,

both factors weigh in favor of the Court transferring this case to the District of Connecticut.

The Court's analysis in Abusadeh v. Chertoff is instructive.  There, as here, the Plaintiff

filed a mandamus complaint seeking to compel USCIS to complete its adjudication of a pending

immigration application.  See 2007 WL 2111036 at *2.  The Plaintiff's application was pending

in a local USCIS field office in Virginia.  See id. at *6.  Plaintiff filed suit in this District, and

named agency officials with offices in Washington, D.C. as defendants.  See id.  District Judge

Kollar-Kotelly concluded that Abusadeh's choice of forum was entitled to little deference

because there were no meaningful ties between this District and pending immigration

applications being adjudicated by a USCIS field office outside Washington, D.C.  See id. at

*6-*8.  Further, the public interests favored transfer because both districts were equally familiar

with the applicable law but the Southern District of Texas had a "superior interest in addressing

the instant controversy because 'there is a local interest in having localized controversies decided

at home.'"  Id. at *8.  The same is true with respect to the District of Connecticut here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court GRANT

Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the District of

Connecticut.

Dated: April 25, 2008                    Respectfully submitted,


                                         /s/_____
                                         JEFFREY A. TAYLOR, D.C. BAR # 498610
                                         United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


/s/
BRANDON L. LOWY,
Special Assistant United States Attorney
555 Fourth St., NW
Washington, D.C.  20530
Phone: (202) 307-0364
Brandon.Lowy@usdoj.gov


Attorneys for Defendants

28

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
MATTHEW J. CHANG,                             )
                                              )
Plaintiff,                                    )
                                              )
v.                                            )          Civil Action No. 07-2139 (RCL)
                                              )
MICHAEL CHERTOFF,                             )
Secretary, Homeland Security, *et al*.,       )
Defendants.                                   )
_____)

**ORDER**

Upon consideration of Defendants' Motion to Dismiss or Transfer, it is this

_____ day of _____, 200_____,

_____ ORDERED that the Motion to Dismiss be and hereby is GRANTED, and
that complaint be and hereby is DISMISSED;

_____ ORDERED that the Motion to Transfer be and hereby is GRANTED, and
that the case be and hereby is TRANSFERRED to the United States
District Court for the District of Connecticut.

SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MATTHEW J. CHANG,<br>a/k/a, Jin Woo Chang,<br>A98 899 066<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL CHERTOFF,<br>Secretary, Homeland Security, *et al.*,<br><br>Defendants. | Civil Action No. 07-2139 (RCL) |

## DECLARATION

I, Ethan Enzer, pursuant to 28 U.S.C. §1746, hereby declare:

1.    I am currently employed as Field Office Director ("FOD") at the Hartford, Connecticut office of U.S. Citizenship and Immigration Services ("USCIS"), an agency within the U.S. Department of Homeland Security ("DHS"). I have held this position since March 1, 2004.

2.    As the FOD, I have the authority to execute declarations in this case, as well as, implement the procedures for background checks. The subject matter of this declaration involves my official duties as a FOD. My current duties include the supervision of the adjudication of applications and petitions for immigration benefits. The information below is based upon review of the files, electronic records, personal knowledge, and other information that has

become known to or supplied to me in the course of my official responsibilities concerning the processing of this application.

3.    The Plaintiff filed an I-485, Application for Adjustment of Status on February 28, 2005. The Plaintiff's application was transferred to the USCIS Hartford Field Office on January 29, 2008.

4.    When an applicant applies for adjustment of status, USCIS conducts several forms of security checks to ensure that the alien is eligible for the immigration benefit and is not a risk to national security or public safety.  In addition to records checks against DHS's own immigration systems, these security checks currently include:  (a) a Federal Bureau of Investigation ("FBI") fingerprint check for relevant criminal history records on the applicant (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System ("IBIS"), which contains records and "watch list" information from more than twenty federal agencies and which includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity; and (c) an FBI name check, which runs the alien's name against investigative and other databases of the FBI containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.  The three types of security checks described above sometimes raise issues impacting an applicant's eligibility for the benefit sought from USCIS.  In those cases, USCIS must conduct further inquiry to resolve any outstanding issues.  On and adjustment application, such as the one filed by the plaintiff, USCIS will await 180 days for a

response from the FBI and proceed with adjudication with or without the FBI name check results.

5.    In many cases, adverse information related to an applicant or beneficiary that is obtained through a security check requires further inquiry by USCIS (sometimes referred to as "vetting"), including outreach to the originating agency to determine whether the information is relevant to eligibility for the requested immigration benefit or may lead to other information bearing on eligibility. The complete background check process includes the security checks but is not limited to those checks. USCIS frequently must take additional steps to fully assess an applicant's background, such as an interview or re-interview of an applicant and/or beneficiary or others, a written request for additional information, or a field investigation.

6.    The FBI fingerprint checks must be completed for each alien applicant for an immigration benefit, as required by Public Law 105-119. USCIS received the results of the most recent FBI fingerprint checks on May 29, 2007. Pursuant to current USCIS policy, fingerprints taken are valid for a period of 15 months after processing by the FBI. Therefore, the current fingerprints are valid until August 28, 2008. If a final decision regarding Plaintiff's application is not reached by that date, another fingerprint appointment will be scheduled for the applicant. IBIS checks were initiated on the applicant on February 13, 2008, and are valid for six months. If a final decision regarding Plaintiff's application is not reached by August 12, 2008, a new IBIS check will be necessary.

7. An FBI name check on the name Matthew Chang was initiated on March 10, 2005. As of April 25, 2008, USCIS has not yet received a response regarding this name check from the FBI. As a result of the process in which name check requests and results are transmitted between USCIS and FBI, it can take numerous months for USCIS to receive a response from the FBI after the name check has been completed.

8. Plaintiff was interviewed on his application for adjustment of status on February 13, 2008. On that date, it was discovered that Plaintiff had two distinct names, "Matthew Chang" and "Jin Woo Chang". Plaintiff provided the name Matthew Chang on his application, yet other documents, such as his birth certificate and G-325 "Biographic Information" Sheet, indicate the name of Jin Woo Chang. However, as USCIS only uses the first page of an application to determine the names to be sent to the FBI for a name check, it was not brought to the attention of USCIS that "Jin Woo Chang" should be submitted to the FBI for a name check until Plaintiff was interviewed on February 13, 2008.

9. On February 13, 2008, following the most recent interview of Plaintiff, I requested of my staff that the name "Jin Woo Chang" be submitted to the FBI for a name check. On April 11, 2008, I learned that my February 13 request had not gone through, and I asked my staff to resubmit the request on that date. As a result of the process in which name check requests and their results are transmitted between USCIS and FBI, it can take numerous months for the FBI to receive a name check request from USCIS. As of April 25, 2008, USCIS has not yet received a response regarding this name check from the FBI.

10.  Pursuant to a USCIS policy initiated on February 4, 2008, USCIS must await the passage of 180 days in order to provide the FBI an opportunity to reply to the name check inquiry. Should the FBI not reply within 180 days, USCIS will proceed to complete adjudication of the application of Plaintiff.

Date

*April 25th 2008*

Ethan Enzer,

Field Office Director

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MATTHEW J. CHANG, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Case No: |
|  | ) 1:07-CV-02139 |
| MICHAEL CHERTOFF, | ) |
| et al., | ) |
|  | ) |
| Defendants. | ) |

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am familiar with the name check request for Matthew J. Chang, the plaintiff in this civil action.

# NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of

disseminating information from the FBI's Central Records System in response to requests

submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

police and intelligence agencies, and state and local criminal justice agencies.  The Central

Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.

The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower

Administration.  That executive order addresses personnel security issues and mandates National

Agency Checks as part of the pre-employment vetting and background investigation process for

prospective Government employees.  The FBI performs the primary National Agency Check

conducted on all United States Government employees.  From this modest beginning, the

Program has grown exponentially, with more and more customers seeking background

information from FBI files on individuals before bestowing a privilege, such as Government

employment or an appointment, a security clearance, attendance at a White House function, a

"green card" or naturalization, admission to the bar, or a visa.  More than 70 federal, state, and

local agencies regularly request FBI name searches.  In addition to serving our regular

Government customers, the FBI conducts numerous name searches in direct support of the FBI's

counterintelligence, counterterrorism, and homeland security efforts.

# EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has

acquired in the course of fulfilling mandated law enforcement responsibilities.  The records

maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files

broken down according to subject matter. The subject matter of a file may relate to an

individual, organization, company, publication, activity, or foreign intelligence matter. Certain

records in the system are maintained at FBI Headquarters. Records which are pertinent to

specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the

FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

indices on various subjects, including the names of individuals and organizations. Only the

information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices

and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

victims. Searches made in the index to locate records concerning particular subjects are made by

searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

    (a)    "main" entries – entries that carry the name corresponding
          with the subject of a file contained in the CRS.

    (b)    "reference" entries – entries (sometimes called "cross-
          references") that generally only mention or reference an
          individual, organization, etc., that is contained in a
          document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS")

system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records

were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

(a)    Investigative Case Management:  This application provides
       the ability to open, assign, and close investigative and
       administrative cases as well as to set, assign, and track
       leads.  A case is opened by the Office of Origin, which sets
       leads for itself and other field offices, as needed.  The
       offices that receive the leads are referred to as Lead Offices.
       When a case is opened, it is assigned a Universal Case File
       Number, which is utilized by FBI Headquarters and all
       offices conducting or assisting in the investigation.  Using
       fictitious file number "111-HQ-12345" as an example, an
       explanation of the Universal Case File Number is as
       follows: "111" indicates the classification for that specific
       type of investigation; "HQ" is the abbreviated form used for
       the Office of Origin of the investigation (in this case, FBI
       Headquarters); and "12345" indicates the individual case
       file number for that particular investigation.

(b)    Electronic Case File:  This application serves as the central
       electronic repository for the FBI's official text-based
       documents.  It supports the universal serial concept, where
       only the creator of a document serializes it into a file,
       providing single source entry of serials into the
       computerized system.  All serials originated by the Office
       of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index:  This application, sometimes referred to as
       "UNI", continues the universal concepts of the ACS system
       by providing a complete subject/case index to all
       investigative and administrative cases.  Only the Office of
       Origin is required to index.  However, the Lead Offices
       may index additional information as needed.  The Universal
       Index, which consists of an index of approximately 100.7
       million records, functions to index names to cases, and to
       search names and cases for use in the FBI investigative and
       administrative cases.  Names of individuals or entities are
       recorded with identifying information such as the date or
       place of birth, race, sex, locality, social security number,
       address, or date of event.

4

(10)    The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the investigative FBI Special Agent, the supervisor in the field

division conducting the investigation, and the supervising FBI Special Agent at FBI

Headquarters. The FBI does not index every name in its files, but indexes only that information

considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this

mass information, information essential to ongoing investigations could not be readily retrieved.

The FBI files would thus be merely archival in nature and could not be effectively used to serve

one of the mandated missions of the FBI, to investigate violations of federal criminal statutes.

Therefore, the General Indices to the CRS files are the means by which the FBI can determine

what retrievable information, if any, the FBI may have in its CRS files on a particular subject

matter.

(11)    When the FBI searches a person's name, the name is electronically

checked against the FBI's Universal Index. The searches seek instances of the individual's

name, social security number, and dates close to his or her date of birth, whether a main file or

reference. As previously stated, any "main" file name would be that of an individual who is,

himself or herself, the subject of an FBI investigation, whereas any "reference" would be an

individual whose name appears as part of an FBI investigation. For example, "references"

include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

reasons to explain why an FBI Special Agent conducting an investigation believed it important to

include a particular name in the FBI's index for later recovery. The names are searched in a

multitude of combinations, switching the order of first, last, and middle names, as well as

combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar

spelling variations (which is especially important considering that many names in our indices

have been transliterated from a language other than English).

(12)   If there is a match with a name in a FBI record, it is designated as a "Hit,"

meaning that the system has stopped on a possible match with the name being checked. If a

search comes up with a match to a name and either a close date of birth or social security

number, it is designated an "Ident."

## RESOLUTION RATE

(13)   There are four stages involved in the completion of an individual name

check: batch processing, name searching, dissemination, and file review. The first stage in the

process, batch processing, involves the transfer of the name check requests from USCIS to the

NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are

transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system

and the names are electronically checked against the FBI's Universal Index (UNI). Historically,

during the batch processing phase, approximately 68 percent of the name checks submitted by

USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record"

indicates that the FBI's Universal Index database contains no identifiable information regarding a

particular individual. A "No Record" result returned to USCIS definitively concludes the name

check process concerning that particular request. Duplicate submissions (i.e., identically spelled

names with identical dates of birth and other identical information submitted while the original

submission is still pending) are not checked, and the duplicate findings are returned to USCIS

within 48-72 hours.

(14)    The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, an expanded manual name search is required. An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. This secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are dissemination and, if needed, file review. (Prior to February 2008, the file review stage preceded the dissemination stage. Because an increasing number of name check requests involve review of electronic records, and in an effort to improve efficiency, the FBI now uses the file review function in the back end of processing to locate paper records on an as needed basis.) As noted, the remaining 10 percent of USCIS requests are identified as possibly being the subject of an FBI record. Analysts in dissemination are responsible for reviewing and analyzing FBI records and providing results to customers. If a record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved through the file review process from an existing paper record. Once the information is retrieved, an analyst in dissemination reviews the records for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

(16)    Apart from the aforementioned stages, a name check occasionally may undergo additional electronic or manual searches depending on the length of time the name check has been pending in the processing queue in the dissemination phase. It is very common for a name check to remain pending in this final stage for an extended period because of the volume of earlier-filed name checks, as well as expedited name checks, that analysts must resolve. During this period, a name check cannot be further processed until it is assigned to an analyst. The additional searches thus are done to ensure that the analyst in the dissemination phase has up to date information prior to completing and disseminating a name check result.

(17)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that name check request came in first, the name check may require additional time until all responsive records are located and reviewed.

(18)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. Based on its own criteria, USCIS determines which name checks are to be expedited. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(19)    Expedited service allows USCIS to allocate name checks toward its highest priorities and generally to minimize possible health and welfare harm to applicants that may arise while an application is pending. However, the FBI limits the number of expedite

8

requests it will accept from USCIS consistent with available resources and personnel, as well as because only a limited number of applications can be expedited for the process to remain meaningful as too many expedited requests would merely reorder the queue and lead to no net benefit. Thus, as it does with most customers, the FBI limits USCIS to 100 expedite requests per week.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (34) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2007, the FBI processed in excess of 4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2007, 52% (~2,113,000) of the total incoming name checks were submitted by USCIS.

9

## USCIS NAME CHECK REQUESTS

(23)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. Because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the

inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 630 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(26)    There are numerous factors that have contributed to delays in the processing of name check requests, including the name check for plaintiff. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for fiscal year 2007, USCIS submitted approximately 2,113,600 name check requests, of which approximately 1,112,400 represented naturalization-related name checks and approximately 794,800 represented adjustment of status-related name checks. As of the end of fiscal year 2007, the NNCPS had over 402,800 pending USCIS name check requests, of which over 167,000 represented naturalization-related name checks and over 197,900 represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

11

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30)    Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

12

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process. Over the short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)    NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)    The FBI is using overtime to maximize productivity. It is also in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload. The employee development program led to the development of a name check employee training manual.

13

(35)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations throughout the United States and the world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. Until recently, fees did not cover the

14

basic costs of providing the service. The FBI procured services to conduct a study to determine

an appropriate fee structure. The independent contractor hired to conduct the study has

completed its work and the proposed fee structure is undergoing the Federal rulemaking process.

Consistent with this process, on October 1, 2007, the FBI began charging increased fees up front

on an interim basis.

(39)    The FBI cannot provide a specific or general time frame for completing

any particular name check submitted by USCIS. The processing of name checks, including those

which are expedited at the request of USCIS, depends upon a number of factors, including where

in the processing queue the name check lies; the workload of the analyst processing the name

check; the volume of expedited name checks the analyst must process for, among others, military

deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such

as critical medical conditions, and loss of Social Security or other subsistence; the number of

"hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of

records from various Field Offices that must be retrieved, reviewed and resolved; and, more

generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary

software NNCPS utilizes to process name checks does not report where in the processing queue a

particular name check request may lie vis-à-vis other name checks. Additionally, until review of

each case is undertaken no estimate for the time required to complete it can even be attempted,

no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can

any reliable estimate be made as to how long it will take to complete the review once it has

begun. While the FBI is sensitive to the impact of the delays in processing name check requests,

the consequence of the FBI's mission on homeland security requires that its name check process

be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible. On occasion, depending on the results provided to USCIS by the FBI, USCIS may require additional followup and coordination with the FBI.

(40)    Despite the constraints described above, the FBI's initiatives have yielded positive results. For example, the total backlog of pending name checks requested by USCIS fell during the first quarter of fiscal year 2008.

(41)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## THE FBI DOES NOT PUBLICLY DISCLOSE NAME CHECKS RESULTS

(42)    Plaintiffs occasionally request access to the documents examined during their name checks. The FBI does not publicly disclose name check results or any underlying "hits" because to do so could alert plaintiffs and/or other individuals to the existence of pending investigations, thus potentially compromising those investigations, confidential sources or investigative techniques. Through channels developed in the FBI's name check process, the FBI discloses derogatory information only to USCIS before USCIS renders final decisions on applicants' petitions. Moreover, the FBI cannot confirm that name check results reveal a person is *not* the subject of an FBI investigative record, because a denial as to one person would imply that silence as to others should be taken as confirmation that they are of investigative interest.

16

## PLAINTIFF'S NAME CHECK REQUEST

(43)   The name check request for plaintiff Matthew J. Chang was received by the FBI from USCIS on or about March 19, 2005 and was completed on February 6, 2008. The FBI performed its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check were forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _23rd_ day of April 2008.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JIANPING SUN,

   Plaintiff,

      v.                                    Civil Action No. 07-504  (JDB)

ALBERTO GONZALES, et al.,

   Defendants.

## ORDER

Plaintiff Jianping Sun, a native and citizen of the People's Republic of China, brings this action against the United States Department of Justice, the United States Citizenship and Immigration Services ("USCIS"), the United States Department of Homeland Security ("DHS"), the Federal Bureau of Investigation ("FBI"), and related officials within these departments. Plaintiff asks this Court to compel defendants to adjudicate without further delay his pending Form I-485 application for an adjustment of immigration status to become a lawful permanent resident.

Plaintiff filed his Application to Register Permanent Residence or Adjust Status (Form I-485) on April 24, 2004, along with a visa petition (Form I-140). Petition ¶ 9. After an alien applies for an adjustment of status, USCIS conducts a number of investigations to ensure that the alien is eligible for the benefit sought and is not a risk to national security. See Decl. of Naboone Puripongs ¶ 2; Fact Sheet at 1. Specifically, USCIS requests (a) an FBI fingerprint check for information relating to an applicant's criminal history within the United States; (b) a check against the DHS-managed Interagency Border Inspection System that "combines information

-1-

from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns"; and (c) an FBI name check, which reviews records maintained in "administrative, applicant, criminal, personnel and other files compiled by law enforcement." Fact Sheet at 2. USCIS also maintains the discretion and the authority to conduct other background investigations when necessary. Id.

According to the USCIS Fact Sheet regarding immigration security checks, "some cases legitimately take months or even several years to resolve" due to the complex, highly sensitive information that is involved in the process. Id. at 2-3. Yet, "USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take." Id. at 1.

Plaintiff's fingerprints were taken and submitted on April 14, 2005. Petition ¶ 9. However, two background checks remain outstanding for plaintiff's application: the FBI name check and the national security background investigation. The FBI name check request for plaintiff was received by the FBI on May 18, 2004, and remains pending. See Decl. of Michael A. Cannon ¶ 22. Also, during the processing of plaintiff's application, USCIS requested a national security screening of plaintiff, which remains ongoing. See Decl. of Naboone Puripongs ¶¶ 8-9.

Believing USCIS has unreasonably delayed the adjudication of his adjustment of status application, plaintiff filed with this Court a petition for mandamus on March 14, 2007. Defendants have now moved to dismiss plaintiff's case for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. The issues in this matter are controlled by this Court's decision in Orlov v. Howard, Civil Action No. 07-350, issued on this

date.  The Court refers the parties to the memorandum opinion issued in <u>Orlov</u> for a full discussion of the issues.

Stated succinctly, this Court lacks jurisdiction to review the ongoing pace at which plaintiff's application is being adjudicated.  The Immigration and Nationality Act, 8 U.S.C. § 1255(a), provides that: "The status of an alien . . . <u>may be adjusted</u> by the Attorney General, <u>in his discretion</u> and under such regulations <u>as he may prescribe</u>, to that of an alien lawfully admitted for permanent residence if" certain conditions are met.[1]  In the absence of statutorily prescribed time limitations or statutory factors to guide USCIS in crafting regulations for the adjustment process, Congress clearly intended to leave the pace of processing adjustment applications within the discretion of USCIS.  Because 8 U.S.C. § 1252(a)(2)(B)(ii) divests federal courts of jurisdiction to review a discretionary decision or action of USCIS, and an "action" includes any discretionary act or series of acts within the adjustment of status process (including the pace of completing various security checks), this Court lacks jurisdiction over plaintiff's petition.[2]

_____

[1]Although the text of 8 U.S.C. § 1255 refers to the Attorney General, the discretionary authority to adjudicate adjustment applications and promulgate regulations has been transferred to the Secretary of Homeland Security and the United States Citizenship and Immigration Services.  <u>See</u> 6 U.S.C. §§ 271(b), 557.  The Court will therefore refer to USCIS as the entity with discretionary authority.

[2]Section 1252(a)(2)(B), provides that:

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review--
(i) any judgment regarding the granting of relief under section . . . 1255 [adjustment of status] . . . , or

The Administrative Procedures Act ("APA") also does not confer jurisdiction upon this Court to review plaintiff's claim because the APA does not apply where "statutes preclude judicial review" or "where agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(1), (2).  And finally, mandamus may not issue here because plaintiff has failed to demonstrate that defendants have a clear duty to increase the pace at which they are processing his application and because plaintiff has failed to demonstrate that he has a clear right to the relief sought.  See In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005) (explaining that "a district court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff'") (quoting Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002)).

Accordingly, upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, and for the reasons stated in the memorandum opinion issued on this date in Orlov v. Howard, it is this 10th day of December, 2007, hereby

**ORDERED** that [8] defendants' motion to dismiss is **GRANTED**; and it is further

**ORDERED** that the case is dismissed against all defendants.

**SO ORDERED.**

> _____/s/ John D. Bates_____
> JOHN D. BATES
> United States District Judge

---

(ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| MOHAMMAD FAYYAZ and<br>GIZELA FAYYAZ,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, et al.,<br><br>                 Defendants. |

Civil Action 06-02016 (HHK)

## ORDER OF TRANSFER

Before the court is the motion of defendants to transfer or, in the alternative, to dismiss [#5]. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion to transfer this action to the Southern District of Texas should be granted. The Southern District of Texas is the more appropriate venue for this action because plaintiffs reside in Houston, Texas, the United States Citizenship and Immigration Services Office with jurisdiction over plaintiffs' adjustment application is there, and plaintiffs' alleged harm occurred there.

Accordingly, it is this 25th day of October, 2007, hereby

**ORDERED** that the Clerk of the Court shall effect the transfer of this action to the Southern District of Texas.

Henry H. Kennedy, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATALIA V. POLIAKOVA,  §
§
　　　*Plaintiff,*  §
§
v.  §  CIVIL ACTION NO. 07-1210 (RCL)
§
EMILIO T. GONZALEZ, DIRECTOR  §
UNITED STATES CITIZENSHIP AND  §
IMMIGRATION SERVICES (USCIS),  §
MICHAEL CHERTOFF, SECRETARY,  §
UNITED STATES DEPARTMENT OF  §
HOMELAND SECURITY,  §
ROBERT S. MUELLER, DIRECTOR,  §
FEDERAL BUREAU OF INVESTIGATION,  §
LINDA SWACINA, DIRECTOR, MIAMI  §
DISTRICT OFFICE, USCIS  §
§
　　　*Defendants.*  §

## <u>ORDER</u>

Upon consideration of Defendants' Motion [11] to Transfer Venue and for Enlargement of

Time to File Answer, it is this 17th day of December, 2007,

ORDERED that Defendants' Motion be, and hereby is, granted, for the reasons stated well in

Defendants' response to Plaintiff's sur-reply; it is further hereby

ORDERED that this case be, and hereby is, TRANSFERRED to the Southern District of Florida;

it is further hereby

ORDERED that Defendants' Answer or other response to the complaint shall be due no sooner

than 15 days after the Southern District of Florida dockets the case in that district.

SO ORDERED.


Signed by United States District Judge Royce C. Lamberth on December 17, 2007.

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **CONNECTICUT** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | | Filings* | 2,437 | 2,460 | 2,530 | 2,717 | 2,752 | 2,816 | U.S. | Circuit |
| | | Terminations | 2,767 | 2,641 | 2,690 | 2,644 | 2,596 | 3,027 | | |
| | | Pending | 2,822 | 3,121 | 3,276 | 3,407 | 3,337 | 3,190 | | |
| | % Change in Total Filings | Over Last Year | | -.9 | | | | | 44 | 3 |
| | | Over Earlier Years | | | -3.7 | -10.3 | -11.5 | -13.5 | 64 | 3 |
| Number of Judgeships | | | 8 | 8 | 8 | 8 | 8 | 8 | | |
| Vacant Judgeship Months** | | | 5.8 | 12.0 | 11.0 | .0 | 6.5 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 304 | 308 | 317 | 340 | 345 | 353 | 77 | 5 |
| | | Civil | 257 | 261 | 272 | 293 | 294 | 307 | 60 | 5 |
| | | Criminal Felony | 30 | 36 | 32 | 35 | 37 | 36 | 90 | 6 |
| | | Supervised Release Hearings** | 17 | 11 | 13 | 12 | 14 | 10 | 65 | 6 |
| | Pending Cases | | 353 | 390 | 410 | 426 | 417 | 399 | 53 | 5 |
| | Weighted Filings** | | 368 | 376 | 379 | 409 | 396 | 420 | 68 | 5 |
| | Terminations | | 346 | 330 | 336 | 331 | 325 | 378 | 71 | 5 |
| | Trials Completed | | 10 | 12 | 15 | 16 | 17 | 20 | 88 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 12.4 | 13.9 | 12.2 | 11.4 | 9.5 | 10.9 | 82 | 3 |
| | | Civil** | 10.5 | 11.6 | 11.4 | 11.6 | 10.5 | 10.1 | 72 | 3 |
| | From Filing to Trial** (Civil Only) | | 27.0 | 29.8 | 32.4 | 31.0 | 30.0 | 31.0 | 54 | 3 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 252 | 339 | 358 | 325 | 318 | 231 | | |
| | | Percentage | 10.4 | 12.5 | 12.3 | 10.7 | 10.6 | 8.1 | 82 | 3 |
| | Average Number of Felony Defendants Filed Per Case | | 1.9 | 1.6 | 1.8 | 1.7 | 1.4 | 1.8 | | |
| | Jurors | Avg. Present for Jury Selection | 60.26 | 52.82 | 56.95 | 63.51 | 54.54 | 46.25 | | |
| | | Percent Not Selected or Challenged | 35.5 | 32.4 | 38.6 | 32.7 | 31.7 | 34.2 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2056 | 50 | 48 | 265 | 47 | 20 | 122 | 291 | 205 | 115 | 496 | 5 | 392 |
| Criminal* | 234 | 1 | 69 | 11 | 29 | 59 | 8 | 14 | 9 | 9 | 3 | 9 | 13 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **DISTRICT OF COLUMBIA** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 2,870 | 2,947 | 3,383 | 3,121 | 3,461 | 3,382 | U.S. | Circuit |
| | Terminations | | 3,016 | 3,458 | 3,305 | 3,365 | 3,101 | 3,159 | | |
| | Pending | | 3,936 | 4,114 | 4,634 | 4,422 | 4,656 | 4,338 | | |
| | % Change in Total Filings | Over Last Year | | -2.6 | | | | | 57 | - |
| | | Over Earlier Years | | | -15.2 | -8.1 | -17.1 | -15.1 | 70 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months** | | 8.2 | .0 | .0 | .0 | 3.1 | 17.1 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 191 | 197 | 226 | 208 | 231 | 225 | 90 | - |
| | | Civil | 161 | 159 | 180 | 163 | 184 | 179 | 84 | - |
| | | Criminal Felony | 21 | 25 | 30 | 32 | 35 | 34 | 94 | - |
| | | Supervised Release Hearings** | 9 | 13 | 16 | 13 | 12 | 12 | 85 | - |
| | Pending Cases | | 262 | 274 | 309 | 295 | 310 | 289 | 79 | - |
| | Weighted Filings** | | 245 | 239 | 272 | 261 | 280 | 271 | 86 | - |
| | Terminations | | 201 | 231 | 220 | 224 | 207 | 211 | 91 | - |
| | Trials Completed | | 13 | 7 | 10 | 15 | 15 | 12 | 72 | - |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 15.3 | 14.4 | 12.9 | 12.8 | 10.2 | 9.6 | 91 | - |
| | | Civil** | 9.0 | 10.2 | 10.8 | 10.3 | 10.3 | 10.5 | 42 | - |
| | From Filing to Trial** (Civil Only) | | 44.0 | 37.0 | 35.0 | 27.4 | 25.0 | 29.0 | 79 | - |
| OTHER | Civil Cases Over 3 Years Old** | Number | 408 | 433 | 468 | 408 | 445 | 359 | | |
| | | Percentage | 14.8 | 15.1 | 14.1 | 12.8 | 12.7 | 11.1 | 88 | - |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.4 | 1.5 | 1.5 | 1.3 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 105.57 | 70.60 | 86.63 | 75.49 | 85.69 | 93.32 | | |
| | | Percent Not Selected or Challenged | 63.2 | 47.2 | 53.6 | 50.4 | 56.6 | 55.7 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2415 | 21 | 85 | 475 | 54 | 21 | 123 | 195 | 128 | 53 | 584 | 30 | 646 |
| Criminal* | 316 | 2 | 120 | 6 | 23 | 68 | 17 | 13 | 3 | 18 | 5 | 25 | 16 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."